**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| SHELLEY FOREMAN, on behalf of herself and all others similarly situated, | ) | |
| Plaintiff, | ) | Civil Action No.: 6:17-cv-02002-RBD-DCI |
| v. | ) | |
| SOLERA HOLDINGS, INC., | ) | |
| Defendant. | ) | |

**PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS**

Pursuant to the Preliminary Approval Order (Doc. 42), Plaintiff now moves for final approval of the class action settlement and for certification of the Settlement Class. Following the entry of this order, notice to the Class was mailed out on November 5, 2018. No class member has objected to the settlement and only 9 individuals have opted out of the class. As of January 17, 2019, 50 claims have been received with the claims period open for another year, running through February 14, 2020.

## I. INTRODUCTION

On May 23, 2018, Plaintiff and Defendant, Solera Holdings, Inc. ("Defendant" or "Solera"), with the assistance of mediator, Rodney A. Max of Upchurch Watson White & Max, reached a settlement (the "Settlement"), which resolved all claims in the above-captioned action (the "Action"). On October 5, 2018, this Court entered an Order granting preliminary approval to the Settlement ("Preliminary Approval Order")[Doc. 42]. Pursuant to the terms set forth in the parties' Class Action Settlement Agreement (the "Settlement Agreement") (attached as Exhibit 1 to Plaintiff's Motion for Preliminary Approval [Doc. 41]) and the Preliminary Approval Order, Plaintiff respectfully requests the Court to enter an order finally approving the Settlement, and certifying the Settlement Class (defined below) for settlement purposes only.

The valuable benefits made available pursuant to the Settlement squarely address the issues raised in the litigation and provide significant relief to the Settlement Class Members. The Settlement provides tiered monetary relief to compensate Settlement Class Members for inconveniences and losses as a result of the disclosure, on or about February 14, 2017, of current and former Solera employees' 2016 W-2 information to an unknown third party (the "Data Disclosure"), as well as injunctive relief related to data security measures and training by Defendant. The Settlement compares favorably with settlements in similar litigation and was

reached only after intensive arm's length negotiations before a skilled mediator. Accordingly, Plaintiff respectfully submits that the Court should approve the terms and conditions of the Settlement.

## II. SUMMARY OF THE SETTLEMENT TERMS

**1. The Settlement Class.** The Settlement Class is an opt-out class under Federal Rules of Civil Procedure 23(a), (b)(3), and (e). It is defined as:

> All current and former Solera employees whose W-2 data was compromised as a result of the Data Disclosure which occurred on or about February 14, 2017.

**2. Proposed Settlement Terms**

The Settlement provides both monetary and injunctive relief. The valuable benefits made available pursuant to the Settlement directly address the issues raised and the relief sought in the litigation and provide significant relief to the Settlement Class Members. The Settlement provides for the following benefits and relief to Settlement Class Members who, except where noted, submit valid Claim Forms:

a. Extension of Identity Theft Protection. Solera will automatically extend the coverage of Experian's IdentityWorks for an additional 24 months on top of the coverage already provided for all Settlement Class Members who enrolled in the program Solera previously offered as a benefit to employees after the Data Disclosure and are still enrolled.

b. Open Enrollment for Identity Theft Protection. All Settlement Class Members who did not previously enroll in the Experian's IdentityWorks service previously offered by Solera will be afforded an opportunity to enroll to receive 24 months of IdentityWorks protection, beginning on the date of enrollment.

c. Reimbursement of Self-Paid Identity Theft Protection. Any Settlement Class Member who purchased identity theft protection on their own from February 14, 2017 through April 15, 2017 (the date on which IdentityWorks was first offered to Solera's employees) may seek reimbursement for the actual cost incurred for up to 12 months of their chosen service, not to exceed $150.00. The class member must submit documentation to prove monthly cost incurred by them. Any Settlement Class Member who seeks reimbursement for self-paid identity theft protection remains eligible to register for the identity theft protection service in Paragraph 2 above or for the extension under Paragraph 1 if applicable.

d. Reimbursement of Expenses. Before submitting a claim for reimbursement of expenses in any of the following categories (Claim A through Claim D below), Settlement Class Members who previously enrolled in the IdentityWorks program offered by Solera must first submit their claim to the insurance provider pursuant to the procedures of the IdentityWorks program and have that claim denied or exhausted. In filing a claim for reimbursement of expenses under the Settlement, Settlement Class Members must submit documentation showing that they submitted such claims to the insurance provider and that the claims were denied or exhausted. Settlement Class Members whose claims for reimbursement are fully reimbursed through the IdentityWorks program are not entitled to reimbursement of such claims under this Settlement Agreement. Settlement Class Members who were or are enrolled in IdentityWorks at the time the expense was or is incurred but who do not submit a claim for reimbursement under the IdentityWorks program or whose claim is not denied or exhausted by the Claim Deadline are not entitled to reimbursement of such claims under

this Settlement Agreement. Settlement Class Members may choose all applicable categories:

e. Claim A: Settlement Class Members who had a false/fraudulent tax return filed after February 14, 2017, will be eligible for a payment of $350. Claimants must provide proof of the false/fraudulent tax return being filed and attest that they have no knowledge of a false/fraudulent return being filed in their name in the 3 years prior to 2017. The sum of the total reimbursement paid under Claim A to all Settlement Class Members shall not exceed $250,000. Should the sum of the total reimbursement claimed under Claim C exceed $250,000, the payments made to Settlement Class Members shall be reduced on a pro rata basis.

f. Claim B: Settlement Class Members who had an IRS tax transcript requested without authorization using their PII after February 14, 2017 and submitted an Identity Theft Affidavit to the IRS shall be entitled to a payment of $150. Claimants must provide proof of the tax transcript request and the submission of the Identity Theft Affidavit, and attest that they have no knowledge of an IRS tax transcript being fraudulently requested using their PII in the 3 years prior to 2017. The sum of the total reimbursement paid under Claim B to all Settlement Class Members shall not exceed $100,000. Should the sum of the total reimbursement claimed under Claim C exceed $100,000, the payments made to Settlement Class Members shall be reduced on a pro rata basis.

g. Claim C: Settlement Class Members who experienced incidents of identity theft related to financial fraud, other than the filing of a false/fraudulent tax return or the unauthorized request for an IRS tax transcript, after February 14, 2017 shall be entitled to

a payment of $250. Examples of the type of identity theft related to financial fraud for which claims may be filed include: attempt to open bank accounts, loan applications, new credit card applications, and governmental applications such as FEMA, FAFSA, SSA, and employment benefits. Excluded from eligibility are incidents of fraudulent charges on existing credit cards. Claimants must provide documentation of the identity theft related to financial fraud or a personal attestation of the details of such activity that includes why documentation is not available. Additionally, Settlement Class Members making a claim under Claim C must attest that they have no knowledge of incidents of identity theft, other than fraudulent credit card activity, in the 3 years prior to 2017. The sum of the total reimbursement paid under Claim C to all Settlement Class Members shall not exceed $100,000. Should the sum of the total reimbursement claimed under Claim C exceed $100,000, the payments made to Settlement Class Members shall be reduced on a pro rata basis.

h. Claim D: Settlement Class Members who claim they suffered out-of-pocket expenses (other than purchase of an identity theft service) as a result of the Data Disclosure shall be entitled to reimbursement of such in an amount not to exceed $500. Claimants must submit reasonable documentation supporting the claim for expenses. Settlement Class Members can also submit a self-verifying statement for time spent dealing with the effects of the breach and be reimbursed for up to 3 hours at $15/hour under this claim. This statement must include a detailed explanation of the activities related to the Data Disclosure for which the time was spent. The sum of the total reimbursement paid under Claim D to all Settlement Class Members shall not exceed $100,000. Should the sum of the total reimbursement claimed under Claim D exceed

$100,000, the payments made to Settlement Class Members shall be reduced on a pro rata basis. The parties recommend that the Claim Deadline be at least 360 days after the Final Approval Hearing to allow sufficient time for Settlement Class Members who previously enrolled in the IdentityWorks program to exhaust the claims procedures of IdentityWorks before filing a claim with the Settlement.

i. Injunctive Relief. In addition to providing the monetary relief as described above, Defendant will undertake the following actions:

j. Cyber Security Training and Awareness Program: on-site cybersecurity trainings that focus on new security protocols for handling requests for personally identifiable information; bi-annual cybersecurity trainings for all Associates, covering different aspects of cybersecurity; internal phishing campaigns to ensure compliance with internal protocols, identify areas of risk, and further educate employees on cybersecurity; regular communications to staff about current cybersecurity issues; and a mandatory annual cybersecurity training video for all High Value Associates with access to personally identifiable information.

k. Data Security Policies: creating, implementing, and training employees on new policies, protocols, and controls related to the ownership, review, and distribution of personally identifiable information and other private data.

l. Enhanced Security Measures For Email Accounts, Servers, And Computers: implementing Exchange Online Protection email routing to assist in the detection of phishing and other fraudulent emails, Specialized Exchange Transport rules to block phishing emails spoofed to appear as originating from executives, Exchange

Transport rules used to detect and thwart credential harvesting emails, and Data Loss Prevention rules to prevent the loss of personally identifiable information.

m. Restricted Access to Tax and Payroll Information: reducing the number of administrators with access to personally identifiable information via the platform that manages its W-2 and payroll information.

n. Testing of Policies: quarterly random testing to validate adherence of employees to Solera's data security policies.

o. Access Audits: conducting audits to monitor attempts by employees to access W-2 and payroll information to ensure adherence to restricted access policies. Through December 31, 2018, Solera will conduct monthly audits. From January 1, 2019 through December 31, 2021, Solera will conduct quarterly audits

**3. Other Key Provisions**

In addition to the benefits of the settlement, Defendant is responsible paying for the costs of claims administration and class notice. These costs will be paid separately by Defendant and will not reduce the relief provided for the Settlement Class. Additionally, Defendant has agreed to pay Plaintiff's counsel's attorneys' fees, costs and reimbursement of litigation expenses, as well as a service award for Plaintiff for her service on behalf of the Settlement Class. Defendant has agreed to pay a court approved service award not to exceed $1,000.00 in recognition of the commitment and effort contributed to the litigation for the benefit of the Settlement Class. And Defendant has agreed to pay court approved attorneys' fees in an amount not to exceed $255,000.00, plus court approved costs and expenses in an amount not to exceed $20,000. The service award and attorneys' fees are in addition to the amounts available to Settlement Class Members and will not detract from the recovery of the Settlement Class.

Because the Settlement Class contains current and former employees of Solera, the parties addressed concerns that Settlement Class Members might have fears of employment retaliation upon filing a claim. To allay any such fears, Solera has agreed to not request or otherwise obtain from the Settlement Administrator a listing or report of the names of Settlement Class Members who file Claim Forms. The Short-Form Notice and Long-Form Notice and Settlement Website advise Settlement Class Members of this agreement by Solera.

## III. SETTLEMENT AGREEMENT PRELIMINARY APPROVAL AND CLASS NOTICE

On October 5, 2018, the Court granted preliminary approval to the proposed Settlement. (Doc. 42.) Pursuant to the Court's Order finding the Notice Program "[satisfies] the requirements of Federal Rule of Civil Procedure 23(c)(2)(B) and (e)(1)," (*id.* at 10), class notice administrator Epiq executed the Notice Program, including disseminating a copy of the Short-Form Notice to Settlement Class Members, and establishing the settlement website and toll-free telephone line. The Declaration of Lindsey Marquez ("Marquez Decl.") filed herewith as Exhibit 1, discusses in detail the implementation of this Notice Program and dissemination of materials to the Settlement Class. As of January 17, 2019, Epiq has distributed, and not determined to be undeliverable, Mail Notice to 4,674 of the 4,798 Settlement Class Members, some 97%. Marquez Decl. ¶¶ 4-6. Epiq's dedicated toll-free number had received 70 calls, the settlement website has received a total of 655 visits, and 50 claims for benefits have been submitted by Class Members. *Id*. at ¶¶ 13, 16. Claims can continue to be submitted through the February 14, 2020 claims deadline. This extended claims period allows sufficient time for Settlement Class Members to exhaust the claims process with IdentityWorks, if required. Thus far, no objections to the settlement and only 9 opt-outs have been received. (*Id*. at ¶¶ 11-12). The deadline for receipt of opt-outs and objections was January 2, 2019.

## IV. ARGUMENT

### 1. Certification of the Settlement Class is Appropriate

As this Court has already held, the Settlement Class meets the requirements for certification for settlement purposes under Rule 23. *See* Doc. 42 at 4. Specifically, the Settlement Class meets the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a), and the predominance requirement of Rule 23(b). Fed. R. Civ. P 23(a)(1)–(4), (b)(3). *Id.*

Specifically, numerosity requires "the class [be] so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). Here, the class includes 4,798 employees and former employees of Solera who had their W-2 Data compromised as a result of the Data Disclosure. Thus, the numerosity requirement is easily satisfied.

The second prerequisite to class certification is commonality, which "requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" and the plaintiff's common contention "must be of such a nature that it is capable of classwide resolution–which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2545 (2011) (citation omitted). "[F]or purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do." *Dukes*, 131 S. Ct. at 2556. Here, the commonality requirement of Rule 23(a)(2) is readily satisfied. There are many questions of law and fact common to the Settlement Class that focus on Defendant's common practice of securing its employees' personally identifiable information "(PII"). *See Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 685 (S.D. Fla. 2013). In this case, questions of law or fact common to the Settlement Class include, among others, the following: (1) whether Defendant

gave the PII of Plaintiff and the Class Members to a third party without authorization; (2) whether Defendant had a duty to protect the PII of Plaintiff and Class Members from disclosure; and (3) whether Plaintiff and Class Members were injured by Defendant's release of their PII.

The next prerequisite to certification, typicality, "measures whether a significant nexus exists between the claims of the named representative and those of the class at large." *Hines v. Widnall*, 334 F.3d 1253, 1256 (11th Cir. 2003); Fed. R. Civ. P. 23(a)(3). A class representative's claims are typical of the claims of the class if they "arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Here, the typicality requirement is satisfied for the same reasons that Plaintiff's claims meet the commonality requirement. In the case at bar, Plaintiff has claims that are similar, if not identical, to members of the Settlement Class. Plaintiff's claims arise from the Data Disclosure, as do the claims of the Settlement Class. Specifically, Plaintiff and Settlement Class Members were subjected to the same conduct—Solera's release of their PII to cyber criminals. As such, Rule 23(a)(3) is satisfied.

Next, Rule 23(a)(4) requires that the class representative "not possess interests which are antagonistic to the interests of the class." 1 Newberg on Class Actions § 3:21. Additionally, the class representative's counsel "must be qualified, experienced, and generally able to conduct the litigation." *Id.*; *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997). The requirement of Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at, 594.

Plaintiff Shelley Foreman's claims are similar if not identical to those of the Settlement Class. Indeed, Plaintiff's claims align perfectly with the claims of the Settlement Class, as her private information was also given to cyber criminals as part of the Data Disclosure. Plaintiff and

the Settlement Class desire the same outcome of this litigation, namely to retrieve the best possible relief from the Defendant and to ensure this type of disclosure does not happen again. Because of this, Plaintiff has vigorously prosecuted this case for the benefit of all members of the Settlement Class. Moreover, there is no conflict or any antagonism between Plaintiff and the Settlement Class. Accordingly, Plaintiffs have the ability and incentive to represent the claims of the Settlement Class vigorously.

Furthermore, Plaintiff has protected the interests of the Settlement Classes by retaining qualified, experienced counsel to represent the Settlement Class. Plaintiff's counsel are nationally recognized for their work prosecuting large, complex class actions. With respect to the adequacy of Class Counsel, they have invested considerable time and resources into the investigation of the facts underlying the claims, including the interviews of class members who contacted Class Counsel, becoming familiar with the strengths and weaknesses of Plaintiff's claims, and the prosecution of this action. Class Counsel have a wealth of experience in litigating complex consumer class action lawsuits, including data breach and other W-2 data disclosure cases, and were able to negotiate a settlement for the Settlement Class that is fair, reasonable, and adequate. Declaration of John Yanchunis in Support of Final Approval, attached hereto as Exhibit 2, (hereinafter "Yanchunis Decl."), ¶¶ 6, 15.

Finally, Plaintiff seeks certification under Rule 23(b)(3), which requires that (i) questions of law and fact common to members of the class predominate over any questions affecting only individuals, and that (ii) the class action mechanism is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3)'s predominance requirement focuses primarily on whether a defendant's liability is common enough to be resolved on a class basis, *see Dukes*, 131 S. Ct. at 2551–57, and whether the

proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Common issues of fact and law predominate in a case "if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *James D. Hinson Elec. Contr. Co. v. BellSouth Telecomms., Inc.*, 275 F.R.D. 638, 642 (M.D. Fla. 2011) (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004)). Common issues readily predominate here because the central liability question in this case — whether Defendant adequately secured its employees' PII— can be established through generalized evidence. See *Klay*, 382 F.3d at 1264 ("When there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position, the predominance test will be met."). Additionally, because the claims are being certified for purposes of settlement, there are no issues with manageability. *Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only certification, a district court need not inquire whether the case, if tried, would present intractable management problems … for the proposal is that there be no trial."). Common questions represent a significant aspect of this case. Several case-dispositive questions could be resolved identically for all members of the Settlement Class, such as whether Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting the PII of Plaintiff and Settlement Class Members, whether Solera was negligent in releasing the PII of Plaintiff Settlement Class Members, and whether Solera's release of such PII constitutes a breach of privacy. Accordingly, this prong of Rule 23(b) is satisfied.

Likewise, resolution of thousands of claims in one action is far superior to individual lawsuits, because it promotes consistency and efficiency of adjudication. *See* Fed. R. Civ. P. 23(b)(3). Indeed, absent class treatment in the instant case, each Settlement Class Member

would have been required to present the same or essentially the same legal and factual arguments, in separate and duplicative proceedings, the result of which would be a multiplicity of trials conducted at enormous expense to both the judiciary and the litigants. Moreover, there is no indication that Members of the Settlement Class have an interest in individual litigation or an incentive to pursue their claims individually, given the amount of damages likely to be recovered, relative to the resources required to prosecute such an action. The proposed Settlement will give the parties the benefit of finality, and because this case has now been settled, pending Court approval, the Court need not be concerned with issues of manageability relating to trial. *See Amchem*, 521 U.S. at 620.

**2. The Settlement Is Fair, Reasonable, and Adequate.**

"Settlement of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice." *Wilson v. EverBank*, No. 14—CIV-22264, 2016 WL 457011, at *6 (S.D. Fla. Feb. 3, 2016). "For these reasons, 'there exists an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Id.* (quoting *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 114 (S.D. Fla. 2005)). "Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits." *Pierre-Val v. Buccaneers Ltd. Partn.*, No. 8:14-CV-01182, 2015 WL 3776918, at *1 (M.D. Fla. June 17, 2015) (quoting *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977).

In deciding whether to approve the Settlement, the Court will analyze whether it is "fair, adequate, reasonable, and not the product of collusion." *Leverso v. Lieberman*, 18 F.3d 1527, 1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

The Court's "judgment is informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Wilson*, 2016 WL 457011, at *6, quoting *Nelson v. Mead Johnson & Johnson Co.*, 484 Fed. App'x 429, 434 (11th Cir. 2012) (quoting *Bennett*, 737 F.2d at 986).

Revisions to Rule 23—effective on December 1, 2018—set for the analysis to be conducted by the Court in determining whether a Settlement is fair, reasonable and adequate: detailed analysis. Proposed Amended Rule 23(e)(2) states:

> **(2)** ***Approval of the Proposal.*** If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> **(A)** the class representatives and class counsel have adequately represented the class;
>
> **(B)** the proposal was negotiated at arm's length;
>
> **(C)** the relief provided for the class is adequate, taking into account:
>
> **(i)** the costs, risks, and delay of trial and appeal;
>
> **(ii)** the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>
> **(iii)** the terms of any proposed award of attorney's fees, including timing of payment; and
>
> **(iv)** any agreement required to be identified under Rule 23(e)(3); and
>
> **(D)** the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2.)

Thus, the revised rule reflects factors already used in the Eleventh Circuit for final approval: (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of the Class Representative's success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representative, and

the substance and amount of opposition to the settlement. *Montoya v. PNC Bank, N.A.*, No. 14-20474, 2016 WL 1529902 at *8 (S.D. Fla. April 13, 2016), (citing *Leverso*, 18 F.3d at 1530 n.6; *Bennett*, 737 F.2d at 986).

The analysis of these factors, set forth below, shows this Settlement to be eminently fair, adequate, and reasonable.

**3. The Settlement Is Not the Product of Fraud or Collusion.**

The first factor for final approval requires the Court to consider whether the Settlement was negotiated at arm's length and not obtained by fraud or collusion among the parties and their counsel. Courts begin with a presumption of good faith in the negotiating process. "Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion." *Wilson*, 2016 WL 457011, at *6 (quoting *Saccoccio v. JPMorgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014)). In such cases, "[t]here is a presumption of good faith in the negotiation process." *Id.*

Here, the Settlement was the result of intensive, arms-length negotiations between experienced attorneys who are familiar with class action litigation and with the legal and factual issues involved in this case. *See, e.g.*, *Blessing v. Sirius XM Radio, Inc.*, 507 F. App'x. 1, 3 (2nd Cir. 2012) (finding that "the district court did not abuse its discretion when it presumed the proposed settlement was fair" where "competent counsel appears on both sides" and "settlement was reached only after contentious negotiations"); *Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 244 (S.D. Ohio 1991) (approving settlement reached "after almost six months of concerted negotiations"). As discussed above, the parties engaged in an in-person mediation session with an experienced and respected mediator, Rodney Max. *See Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1384 (S.D. Fla. 2007) (concluding that class settlement

was not collusive in part because it was overseen by "an experienced and well-respected mediator"); *Lipuma*, 406 F. Supp. 2d at 318–19.

There is no doubt this Settlement was at all times arms-length, and it therefore carries a presumption of fairness. Where there "is no evidence of any kind that the parties or their counsel have colluded or otherwise acted in bad faith in arriving at the terms of the proposed settlement . . . counsel's informed recommendation of the agreement is persuasive that approval is appropriate." *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 633, 703 (M.D. Fla. 2005). And here, Class Counsel are in favor of this proposed settlement and recommend it. Yanchunis Decl. ¶¶ 6, 25.

**4. The Complexity, Expense, Risk, and Duration of Further Litigation Supports Approval of the Settlement.**

The claims and defenses in this case are complex and vigorously contested. Continued litigation will involve substantial delay and expense, which further counsels in favor of final approval. This matter arises from an employee of Defendant responding to a phishing scheme. Although business email phishing and spoofing scams have been on the rise over the last several years, 2016 was the first year the W-2 phishing scheme at issue here was first employed.[1] While courts continue to address the application of existing laws in the context of payment card data breaches that have exploded over the last several years, these W-2 cases do not involve similar hacking of computer systems and exfiltration of personal data, and instead, present their own novel legal ideas. Some of the unique issues presented in these W-2 cases include: whether Plaintiff has Article III standing; whether the Plaintiff would have to arbitrate her claims individually; whether an employer owes a duty of care to its employees when collecting and

[1] Brian Krebs, *Phishers Spoof CEO, Request W2 Forms*, KREBS ON SECURITY *available at* http://krebsonsecurity.com/2016/02/phishers-spoof-ceo-request-w2-forms/ (last visited August 8, 2018).

storing their tax information; whether Solera already utilized adequate cybersecurity practices; whether Plaintiff can show the Data Disclosure caused Plaintiff's harm; whether Plaintiff suffered damages, and if so, what types of damages would be available at trial; whether the disclosure of W-2 information constitutes an "invasion of privacy"; whether disclosure of an employee's W-2 information is a consumer transaction subject to Florida's Deceptive and Unfair Trade Practices Act (and, if applicable, other similar state statutes); and, whether plaintiffs can obtain and maintain class certification.

In fact, this case is especially apt for class settlement because there remain questions as to whether, as part of her employment agreement, Plaintiff (like, presumably, most Settlement Class Members) signed a valid arbitration agreement that included a class action waiver. The fact that the Settlement provides relief on a classwide basis—an outcome that may not be possible absent the Settlement—must weigh heavily in favor of the reasonableness of the settlement. And regardless of the outcome, a motion to compel arbitration would create substantial delay and expense for both parties.

Moreover, even if Plaintiff is permitted to litigate these claims in District Court and succeeds in obtaining class certification on a contested basis, Plaintiff and the Class would still inevitably face a challenge to the certification decision of the Court, as well as summary judgment, a trial on the merits, and a post-judgment appeal. The uncertainties and delays from this process would be significant. Complex litigation – like the instant case – "can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." *Wilson*, 2016 WL 457011, at *7 (quoting *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992)). As a result, recovery by any

means other than settlement will undoubtedly require additional complex, protracted and expensive litigation.

In addition, in evaluating this factor, "[t]he court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'" *Lipuma*, 406 F. Supp. 2d at 1323 (quoting *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993)). Because the "demand for time on the existing judicial system must be evaluated in determining the reasonableness of the settlement," *Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992), there can be no doubt about the adequacy of the present Settlement, which provides meaningful benefits to the Settlement Class. Considering the uncertainties inherent in continued litigation, including trial and an appeal, along with the delays and complexities inherent in this type of litigation, settlement is in the best interest of Plaintiff and the Settlement Class. *Lipuma*, 406 F. Supp. 2d at 1324.

**5. The Factual Record Was Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment.**

The stage of proceedings at which settlement is reached is "evaluated to ensure that Plaintiff had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Wilson*, 2016 WL 457011, at *7 (quoting *Lipuma*, 406 F. Supp. 2d at 1324).

Class Counsel thoroughly investigated and analyzed the facts and circumstances relevant to the claims brought by Plaintiff in this case. The parties exchanged a substantial amount of information through the Settlement and mediation process. Defendant provided substantive answers to all relevant inquiries in the context of settlement negotiations. *See Whitaker v. Navy*

*Fed. Credit Union*, Civ No. RDB 09-cv2288, 2010 WL 3928616, at *3 (D. Md. Oct. 4, 2010) (settlement was fair where parties had briefed motions to dismiss and conducted investigations in the context of settlement negotiations). Both sides zealously pressed their positions throughout the litigation process, during the course of the mediation, and continued to do so while negotiating the language for their formal written agreement. *See* Yanchunis Decl. ¶ 4.

**6. The Likelihood of Success at Trial Supports Approval of the Settlement.**

"By far the most important factor in evaluating the fairness and adequacy of a settlement is the likelihood and extent of any recovery from the Defendant absent the settlement." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 314; *see also Ressler*, 822 F. Supp. at 1555 ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise.").

The Settlement here is compelling given the substantial litigation risks the Settlement Class faced. First, while the Settlement provides meaningful benefits to all Class Members and was designed to address the very type of injury which members of the class would sustain as a result of the release of their sensitive personal information to a malicious actor, certifying a litigation class would have been challenging. The Settlement, however, provides relief for all affected Class Members. Moreover, the proposed settlement provides certain, present, and substantial relief. *Bennett v. Behring Corp.*, 96 F.R.D. 343, 349 (S.D. Fla. 1982) (Plaintiff faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and the amount of damage," making it "unwise [for Plaintiff] to risk the substantial benefits which the settlement confer[red] … to the vagaries of a trial"), *aff'd*, 737 F.2d 982 (11th Cir. 1984).

Plaintiff's success in this matter was not guaranteed, particularly as other courts have addressed the novel legal questions presented in similar W-2 disclosure cases and have issued mixed bag of decisions, keeping the law still unsettled. See, e.g., *Castillo v. Seagate Tech., LLC,* 16-cv-01958, 2016 U.S. Dist. Lexis 187428 (N.D. Cal. Sept. 14, 2016) (granting defendant's motion to dismiss as to plaintiffs' claims for negligence, California's unfair competition law, and declaratory judgment.); *Giroux v. Essex Prop. Tr.*, 16-Cv-01722, 2017 U.S. Dist. Lexis 66197, at *5 (N.D. Cal. May 1, 2017) (dismissed on the basis of Article III standing); *Savidge v. Pharm-Save, Inc.*, 3:17-Cv-00186, 2017 U.S. Dist. Lexis 197635 (W.D. Ky. Dec. 1, 2017) (dismissing plaintiff's invasion of privacy claim finding that their information had not been communicated to the public at large). Further, class certification has been denied in other consumer data breach cases and it was not until 2017 that the first litigation class was certified in a consumer data breach case, *Smith v. Triad of Alabama, LLC*, 2017 WL 1044692, at *16 (M.D. Ala. Mar. 17, 2017).

Indeed, even had Plaintiff survived Defendant's motion to dismiss and certified a class, substantial barriers to success would remain. For example, Plaintiff would have to establish that the Data Disclosure caused the harms for which Plaintiff sought recovery and that Defendant did not employ adequate cybersecurity measures. These requirements, amongst others that Plaintiff would have to show to succeed in her claims, would require substantial factual investigation and discovery and may be difficult for Plaintiff to prove to a jury.

Moreover, even Plaintiff was successful in establishing liability at trial, which has not yet occurred in a data breach consumer class action, the jury could award damages in an amount lower than that sought by the Class or the amount offered in the Settlement. *See In re*

*Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1334 (N.D. Ga. 2000) ("[T]he trial process is always fraught with uncertainty.").

By settling now, practical remedies and benefits become available to Settlement Class Members without further delay. Maintaining the confidentiality and security of personal, private information is paramount for individuals. Immediately available identity theft protection services and immediate changes to Solera's data security practices help achieve that goal. Identity theft protection services work to prevent and detect misuse of information compromised in the Data Disclosure, while commitments by Defendant regarding its data security practices will work to reduce the risk of future security events. These benefits would not be worth as much value to Settlement Class Members if they had to wait for a trial, a judgment, and exhausted appeals.

Assessed against the delays and uncertainties associated with trial and appeals, the Settlement provides immediate, substantial economic benefits that are fair and reasonable, and has stated earlier, designed to redress the particular repercussions arising from the conduct at issue in the case.

**7. The Benefits Provided by the Settlement are Fair, Adequate and Reasonable Compared to the Range of Possible Recovery.**

In determining whether a settlement is fair in light of the potential range of recovery, "the focus is on the possible recovery at trial." *Wilson*, 2016 WL 457011, at *7 (quoting *Saccoccio*, 297 F.R.D. at 693). "[T]he fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens*, 118 F.R.D. at 542. Indeed, "[a] settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Id.* This is because a settlement must be evaluated "in light of the attendant risks with litigation." *Thompson v. Metropolitan Life Ins.*

*Co.*, 216 F.R.D. 55, 64 (S.D.N.Y. 2003); *see also Bennett*, 737 F.2d at 986 ("[C]ompromise is the essence of settlement."). Thus, courts regularly find settlements to be fair where "[p]laintiffs have not received the optimal relief." *Warren v. City of Tampa*, 693 F. Supp. 1051, 1059 (M.D. Fla. 1988); *see also, e.g.*, *Great Neck Capital Appreciation Investment P'ship, L.P. v. PriceWaterHouseCoopers, L.L.P.*, 212 F.R.D. 400, 409–10 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement.").

In negotiating the amounts to be paid under the Settlement, including the aggregated caps, Plaintiff's Counsel relied upon published reports documenting data breach and identity theft costs, actual costs incurred by Class Members (as relayed in conversations with Plaintiff's Counsel), their own experience in other data breach litigation where Social Security numbers had been stolen, and reported settlements in other data breach class actions.

According to *The Aftermath of a Data Breach: Consumer Settlement (April 2014)*, sponsored by Experian Data Breach Resolution and conducted and reported by Ponemon Institute, the average out-of-pocket expenses incurred by victims of a data breach is $38.00.[2] This research report also found that 81% of data breach victims did not have any out-of-pocket expenses. *Id*. The second highest percentage of victims spent less than $10.00 to resolve any consequences of the data breach. *Id*. at 18. Further, 34% of data breach victims indicated they were able to resolve any problems resulting from the breach within one day. *Id*. at 7.

For individuals who experienced actual identity theft, a 2014 Congressional Report stated

---

[2] *The Aftermath of a Data Breach: Consumer Settlement* (April 2014), p.7, available at https://www.ponemon.org/local/upload/file/Consumer%20Study%20on%20Aftermath%20of%20a%20Breach%20FINAL%202.pdf.

that these victims incurred an average of $365.00 in expenses in deadline with the fraud.[3] This report prepared for Congress was based upon analysis conducted by Javelin Strategy & Research in 2013 which focused on individuals who had experienced identity theft as a result of a data breach. [4] This study also reported that the recovery costs for victims are decreasing. *Id.*

Here, the Settlement provides tiered relief, ranging from $150 - $350, to those Class Members who have suffered identity theft. Settlement Agreement § IV.15(d). Settlement Class Members are eligible to make a claim for each category of identity theft they have experienced. *Id.* Additionally, Settlement Class Members can make a claim for up to $500 for any out-of-pocket expenses related to the Data Disclosure, including time spent dealing with the effects of the Data Disclosure. *Id.* Thus, the benefits provided by the Settlement exceed reported national averages.

As discussed, the benefits available here compare favorably to what class members could recover if successful at trial. Specifically, Settlement Class Members are able to recover damages for the particular manner in which the misuse of their personal information to a malicious actor affected them. A successful trial on the merits would have led to the same or similar relief, albeit in the form of a money judgment. In satisfaction of Rule 23(e)(2)(D), the multiple tiers for monetary claims allow Settlement Class Members to obtain relief based upon the specific types of damages they incurred and treats every claimant in those categories equally relative to each other. In the experience of Plaintiff's counsel who have litigated a number of cases similar to the one here, and having spoken to the employees of other companies affected by the same conduct at issue here, as well as reviewing claims date following the successful

---

[3] Kristin Finklea, Congressional Research Service, *Identity Theft: Trends and Issues* (January 16, 2014), p. 2, available at https://fas.org/sgp/crs/misc/R40599.pdf

[4] Javelin Strategy & Research, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, February 2013.

resolution of those cases, the relief provided by this settlement should be considered a solid victory for the class.

Moreover, "[u]nder Eleventh Circuit law, injunctive changes . . . represent a benefit to the class and should be considered when approving a class settlement." *Marty v. Anheuser-Busch Companies, LLC*, 13-CV-23656-JJO, 2015 WL 6391185, at *2 (S.D. Fla. Oct. 22, 2015) (citing *Poertner v. Gillette Co.*, 618 Fed. Appx. 624, 629 (11th Cir. 2015)). Thus, "courts rightly consider the value of injunctive and monetary relief in assessing whether a class action settlement provides sufficient relief to the class." *Montoya v. PNC Bank, N.A.*, 1420474CIVGOODMAN, 2016 WL 1529902, at *14 (S.D. Fla. Apr. 13, 2016).[5]

The injunctive relief provided for in this Settlement is significant and advances and ensures the rights of the class because it swiftly commits Defendant to certain security training and protection of personal information that is critical to any company with the personal information that Defendants have for the Settlement Class Members. The data security policies and training provided by the Settlement are particularly meaningful in a case such as this because the personal information of employees remains in the possession of Defendants. The injunctive measures in the Settlement are squarely consistent with the claims that Plaintiff had focused on in the litigation. These commitments will ensure the adequacy of Solera's data security practices, and will provide ongoing protection for the Settlement Class Members' information.

[5] *See also, e.g.*, *Wilson*, 2016 WL 457011, at *13–14 ("In considering the results, courts examine the value of *both* monetary and injunctive relief.") (emphasis in original); *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1342–43 (S.D. Fla. 2007) ("[W]hen determining the total value of a class action settlement . . . courts usually consider not only the compensatory relief, but also the economic value of any prospective injunctive relief obtained for the class.") (citing *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003)); *Perez v. Asurion Corp.*, 06-20734-CIV, 2007 WL 2591180, at *4–5 (S.D. Fla. Aug. 8, 2007) ("Courts consider not only the compensatory relief, but also the value of any prospective injunctive relief obtained for the class as a 'relevant circumstance.'") (quoting *Staton*, 327 F.3d at 974)).

Without this Settlement, there is nothing Settlement Class Members could do individually to achieve similar promises regarding the security of the storage of their personal information on Solera's data systems. The Settlement is calculated to ensure that Solera not only employs the necessary, immediate resources to address existing data transmission and security vulnerabilities, but uses the consistent practices and accountabilities needed for long-term, proactive data security.

Class Counsel assert that the Settlement benefits provided to Plaintiff and Class Members through this Settlement present a substantial recovery, especially considering the strengths of the claims and the litigation risks described above.

**8. The Opinions of Class Counsel, Class Representatives, and Absent Settlement Class Members Favor Approval of the Settlement.**

In addition to the factors discussed above, the Court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren*, 693 F. Supp. at 1060; *see also Domestic Air*, 148 F.R.D. at 312–13 ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'") (citations omitted).

> This Court, like others, considers the reaction of the class, as well as the reaction of the various state attorney generals and regulators, to the proposed settlement to be an important indicator as to its reasonableness and fairness. Obviously, a low number of objections suggests that the settlement is reasonable, while a high number of objections would provide a basis for finding that the settlement was unreasonable.

*Howard Braynen, et al. v. Nationstar Mortgage, LLC, et al.*, 2015 WL 6872519 (S.D. Fla. 2015) (internal citations and quotation marks omitted).

Here, Class Counsel wholeheartedly endorses the Settlement. *See* Yanchunis Decl. at; Additionally, the reaction of the Settlement Class to the Settlement here has been extremely positive, as no objections and only 9 opt-outs were received. These are powerful indicia that the Settlement is fair, reasonable, and adequate and deserves final approval. *See Hall v. Bank of America, N.A.*, No. 1:12-cv-22700, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014) (noting where objections from settlement class members "equates to less than .0016% of the class" and "not a single state attorney general or regulator submitted an objection," "such facts are overwhelming support for the settlement and evidence of its reasonableness and fairness"); *Hamilton v. SunTrust Mortg. Inc.,* No. 13-60749, 2014 WL 5419507, at *4 (S.D. Fla. Oct. 24, 2014) (where "not a single state attorney general or regulator submitted an objection," and there were few objections to the class settlement, "such facts are overwhelming support for the settlement").

## V. CONCLUSION

Given the positive result achieved in the face of uncertain circumstances, and considering the positive response by Settlement Class Members, Plaintiff now asks this Court to finally approve the settlement as fair, reasonable, and adequate, and enter a final judgment. The valuable benefits made available pursuant to the Settlement squarely address the issues raised in the litigation and provide significant relief to the Settlement Class Members. The Settlement provides tiered monetary relief to compensate Settlement Class Members for inconveniences and losses as a result of the Data Disclosure, as well as injunctive relief, which takes the form of important data security measures and training. The Settlement compares favorably with

settlements in similar litigation and was reached only after intensive arm's length negotiations before a skilled mediator.

Based on the foregoing, Plaintiff respectfully request that the Court enter a Final Order and Judgment Certifying the Class, approving the Class Settlement, and dismissing the action with prejudice.

<u>Local Rule 3.01(g) Certification</u>

In accord with Local Rule 3.01(g), Plaintiff conferred with Defendant regarding the relief requested in this motion and Defendant does not object to the relief sought herein but only in connection with the proposed settlement of this case. In the event that the Settlement is not approved, the Settlement Agreement is terminated for any reason, or the Effective Date, as defined in the Settlement Agreement, does not occur for any reason, Defendant reserves all defenses in the case and specifically reserve the right to object to this case proceeding on a class-wide basis for any purpose.

Dated: January 29, 2019

Respectfully submitted,

/s/ *John A. Yanchunis*

JOHN A. YANCHUNIS
jyanchunis@ForThePeople.com
MARISA GLASSMAN
mglassman@ForThePeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

JEAN SUTTON MARTIN
jeanmartin@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP

2018 Eastwood Road Suite 225
Wilmington, NC 28403
Telephone: (813) 559-4908
Facsimile: (813) 222-4795

***Attorneys for Plaintiff and the Proposed Class***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via e-mail to all counsel of record on this 29th day of January, 2019.

/s/ John A. Yanchunis